CLERK'S OFFICE
U.S. DISTRICT COURT
AT ROANOKE, VA
FILED
December 23, 2025
LAURA A. AUSTIN, CLERK
BY: s/ M.Poff, Deputy Clerk

## IN THE UNITED STATES DISTRICT COURT
## FOR THE WESTERN DISTRICT OF VIRGINIA
## ROANOKE DIVISION

| | | |
|---|---|---|
| **KENNETH J. BROWN,** | ) | |
| **Plaintiff,** | ) | **Civil Action No. 7:24cv00461** |
| | ) | |
| **v.** | ) | **MEMORANDUM OPINION** |
| | ) | |
| **SOUTHWEST VIRGINIA REGIONAL** | ) | **By: Robert S. Ballou** |
| **JAIL, et al.,** | ) | **United States District Judge** |
| **Defendants.** | ) | |

Kenneth J. Brown, a Virginia inmate proceeding *pro se*, has filed this civil rights action under 42 U.S.C. § 1983 against the Southwest Virginia Regional Jail, Dr. Amit Shah, a correctional officer, and several nurses, alleging violation of his right to decent conditions in prison, denial of adequate medical care, and deliberate indifference by Dr. Shah. Dr. Shah and Jennifer Addington, LPN, have filed a Motion for Summary Judgment. Brown has also filed a Motion for Summary Judgment. For the reasons stated below, I will grant the defendants' Motion for Summary Judgment as to Nurse Addington, grant in part and deny in part the Motion for Summary Judgment as to Dr. Shah and deny Brown's Motion for Summary Judgment.

## I. FACTUAL BACKGROUND

Brown entered Southwest Virginia Regional Jail-Abingdon (SWVRJ) on December 19, 2023, to begin serving a three-year sentence imposed that day by the Russell County Circuit Court. He brought his prescription medications with him to minimize disruption in his medication regime and to prove what prescriptions he was taking. Brown suffers from generalized anxiety disorder, persistent depressive disorder, and post-traumatic stress disorder (PTSD) since observing the death of his father in a logging accident in 2019. Dkt. No. 73-3 at 19–21. He also has COPD, high blood pressure, high cholesterol, asthma, history of stroke, and

history of alcohol and opiate addiction. *Id.* at 1, 3. Finally, he had pins and screws in his right leg following open surgical reduction and internal fixation of injuries to his leg in a logging accident six or seven years earlier, and a hairline fracture in the right foot a year before going into custody. *Id.* at 4, 10, 16. In March 2024, he was transferred from SWVRJ-Abingdon to SWVRJ-Duffield. The same health care providers treated him at both facilities.

## A. <u>Medication Issues</u>

Upon review of Brown's medications at intake, the Jail's psychiatrist, Dr. Shah, changed the administration of Brown's Wellbutrin prescription from one 300 mg. extended release (XL) tablet per day to two 150 mg. regular tablets, one in the morning and one in the evening.[1] The overall dose remained the same. Dr. Shah made this change because Wellbutrin is administered in crushed form in the jail to prevent hoarding and misuse by inmates. Dr. Shah says that Wellbutrin is highly addictive and sought by inmates. The 300 mg. XL tablet cannot be administered in crushed form because crushing the pill eliminates the extended-release properties, causing the full dose to be ingested at once, which could cause unsafe side effects, including seizures. Dkt. No. 73-2, ¶¶ 6-9. Otherwise, Brown's medication regime was continued without change.

On April 6, 2024, Nurse Addington observed Brown make a fist after he received his morning pills. He put his fist up to his mouth and drank some water. Suspecting that he might be hoarding his medication, she asked Brown to open his hand. When he did, she saw medicine still in his hand. Nurse Addington told Brown to take the medications, and he did. According to the chart note, Nurse Addington told Brown that "this is not the first time [you have] tried to hold

---

[1] In his opposition to the summary judgment motion, Brown states that rather than two 150 mg. tablets, he received two 75 mg. tablets twice a day (total of 4 tablets), which he was getting crushed in water. Dkt. No. 84. This dispute is **not** a dispute of material fact. Two 150 mg. tablets equal four 75 mg. tablets equal one 300 mg. extended-release pill. It is irrelevant to the issues that a factfinder must resolve to decide this case.

[your] medications on me" and that she was going to notify the doctor.  Dkt. No. 73-3 at 15.

Brown filed a grievance that same morning, April 6, stating "nurse on morning shift said she was

going to have my medication took for a while you can't take mental health meds she is not a

doctor getting tired of her therts (sic) this is twice and her attitude is alful (sic) . . ."  *Id.* at 46.

Pharmacy nurse R. Carter responded to the grievance that night, saying "due to numerous

attempts of hoarding medications[,] medications have been placed on hold x 30 days."  *Id.*

Brown maintained that he had not been trying to hoard the medicine, but that he could not

swallow them all at the same time.  *Id.* at 13.  The medication administration record (MAR)

indicates he was receiving seven different prescriptions during morning pill rounds.

Notwithstanding Nurse Carter's response to Brown's grievance, April 6, 2024, is the only

date on which personal observation of suspected hoarding is documented in the chart.  In fact,

the MAR shows Brown compliant with his Wellbutrin, 97% in January and 100% in February.

March reflected a lower percentage, in large part because the Jail ran out of the medicine and did

not have any to give him on several days.  *Id.* at 31–34.  The MAR also indicates that the

Wellbutrin tablets were to be crushed and administered under water.  *Id.* at 31, 33, 35.

Defendants assert that only Wellbutrin was discontinued.  Dkt. No. 73 at 4 n.1.  The

medical records do not support that assertion, nor does the Affidavit of Nurse Addington.  Dkt.

No. 73-1, ¶ 10.  Nurse Addington's chart notes of April 6, 2024, state in the bottom left corner,

"Per C. Large FNP D/C naltrexone, place wellbutrin (sic), mobic (sic), and nortriptyline on hold

for 30 days and notify mental health."  Dkt. No. 73-3 at 15.  After that, the medication

administration record shows that Wellbutrin (bupropion), nortriptyline, naltrexone, and

meloxicam (Mobic) were no longer administered.  at 34–35.  On April 10, Brown filed a medical

grievance that he needed his pain medication and his Wellbutrin, which he had been prescribed

for years, and although Wellbutrin was supposed to be the only medicine he had to take crushed, his blood pressure medicine was being crushed now. Pharmacy nurse R. Carter advised that the health care providers have discretion whether to crush medication or withhold it, and "in 30 days mental health and medical will see you to restart wellbutrin (sic), mobic (sic), and nortriptyline." *Id.* at 48. Naltrexone is used for treatment of opioid use disorder and alcohol use disorder as part of medically assisted treatment. Brown's naltrexone prescription was completely discontinued.

Brown consistently asserted that he had not been trying to hoard his medicine and that he needed his prescriptions. Disciplinary charges filed against him for hoarding were dismissed. On April 13, 2024, Brown submitted a sick call request, advising that he was found not guilty on the charge of stockpiling meds and asking when he could get put back on his medication, stating simply, "I need them." *Id.* at 93. Nurse Carroll responded within 20 minutes, saying that his request had been sent to the doctor and to mental health to review. *Id.* On April 14, he filed a grievance, asking when he was going to get all his medication and noting that he had been found not guilty of the charge Nurse Addington wrote. He specifically noted that he had been on Wellbutrin for years, and having been without it for a week, he was not feeling right. *Id.* at 49. On April 15, he spoke to Jill Pearce, Qualified Mental Health Provider, and advised her that he had been found not guilty of the hoarding charge. She explained that the doctor can still place medications on hold if he believed that Brown had been hoarding medications. *Id.* at 28.

On April 18, Brown met with Rachel Hicks, a resident in counseling, and told her he was having night terrors, cried at the drop of a hat, had no appetite, couldn't sleep, and kept thinking about being covered in blood and witnessing his dad being killed. He expressed frustration that a nurse could lie and get his medicine taken away when he had been on it for years and had not done anything wrong. Hicks noted that Brown appeared anxious and agitated, but also logical

4

and oriented.  She planned to follow-up with Dr. Shah to see about an earlier medication review

for Brown the following week.  *Id.* at 27–28.

In his Affidavit, Dr. Shah acknowledged that the resident in counseling followed up with

him about a medication review and that Brown had reported night terrors, insomnia, heightened

emotions, and loss of appetite.  He then said that while reviewing the medications, he noted that

Brown "had been caught hoarding medications at least five times during his incarceration," and

because this was a "recurring issue" he decided to continue holding the Wellbutrin until Brown

could be reassessed by mental health staff.  He documented the plan in Mr. Brown's chart on

April 24.  Dkt. No. 73-2 at ¶¶ 13-14.  The April 24 chart note says that Brown had "been caught

hoarding wellbutrin (sic) 5 times as per Jill."  Dkt. No. 73-3 at 1. When Jill told him this or

where she got the information is not stated, but the only suspected hoarding incident documented

was April 6.

Brown saw Nurse Practitioner Crystal Large on April 22, wanting to get back on his

medicines.  He also told her that the chronic pain in his ankle was worse, and ibuprofen was not

working.  She ordered that he re-start Mobic that day and that he follow up with mental health

about getting his other medications back.  Dkt. No. 73-3 at 12–13.

On April 25, Brown sent an inquiry to mental health, stating "I thought I was going to see

someone yesterday."  *Id.* at 96.  He received a response from 6.6955[2] on April 26, saying "The

psychiatrist reviewed your chart and medications will remain on hold.  I have you scheduled to

see him when your hold is up."  *Id.*  On April 26, Brown sent another request, saying "I can't

sleep and getting very depressed I need my meds back and something for sleep having night

---

[2] Some responses to grievances or inquiries were captioned, "Response by [number]" instead of by a person's name.
*See, e.g.,* Dkt. No. 73-3 at 96, 98 (Response by 6.6955) and at 65 (Response by M.M1159).  The court does not
know who these people are.

[terrors] and cold sweets (sic) cry a lot don't understand why I'm being punished for something I didn't do this is crazy." The response from 6.6955 said, "Please see previous response. Thank you." *Id.* at 98.

On May 5, 2024, Brown sent a request to medical, indicating that Nurse Addington had told him to "[write] out to get the hold off" his medicines because the 30 days were up, and he hoped to start getting his medication the next day. *Id.* at 102. On May 6, he sent a request to mental health, noting that he had expected to get his medicine back that morning because the 30 days were up, and he had not done anything wrong. The response from mental health, 6.6955, said "You are scheduled to be seen today by the psychiatrist." *Id.* at 101.

Dr. Shah acknowledged that Brown complained of anxiety symptoms on May 6 when he came for reassessment. He decided to discontinue the Wellbutrin rather than reinstate it because of the "multiple hoarding attempts," but he prescribed other antidepressants, Effexor and Remeron, to relieve Brown's symptoms. Despite his order to discontinue Wellbutrin, from the medication administration record, he knows the Wellbutrin was restarted on May 7, 2024, and Brown remained on Wellbutrin until July 7, along with Effexor and Remeron. Dkt. No. 73-2 at ¶ 16. Dr. Shah did not renew the prescription on July 7, because Brown was on Effexor and Remeron, but Brown asked to be placed back on Wellbutrin. *Id.* at ¶ 17.

On July 12, Jill Pearce advised Dr. Shah that Brown reported worsening anxiety since stopping the Wellbutrin, and he asked that it be reinstated. Dr. Shah told Ms. Pearce that he would reassess Brown the next week. *Id.* at ¶ 18. Brown, meanwhile, presented to the medical unit for a blood pressure check, complaining of chest and neck symptoms. His blood pressure was 180/80 and his oxygen saturation was slightly low at 93%. Nurse Addington noted that Brown was shuffling from side to side and moving his arms. She also noticed his hand shaking,

which he attributed to growing anxiety from being off his Wellbutrin.  The nurse also observed

that his voice was very loud sometimes, and then quiet, and that his conversation kept jumping

from one place to another.  Brown was moved to medical for monitoring.  Nurse Addington also

called mental health to advise of his situation.  She was told that he was on the list for a follow-

up visit.  Dkt. No. 73-3 at 7-8.

While he was still in the medical unit, in the early morning of July 17, Brown complained

of tingling in his face and left arm, pain in the left side of his chest, and pain in the back of his

head. His blood pressure was 182/88. An EKG was done, and Nurse Gollaway gave him a baby

aspirin.  At 12:50 a.m., his blood pressure was 190/120, his pulse was 142, and his oxygen

saturation was 94%.  He was given a dose of nitroglycerin.  Five minutes later, his blood

pressure was 189/118, pulse 134, and oxygen saturation at 96%.  He was given a second dose of

nitroglycerin.  At 1:00 a.m., his blood pressure was 186/109, pulse was 146, and oxygen

saturation was 96%.  He was given a third dose of nitroglycerin and sent to the Emergency Room

at Lonesome Pine Hospital.  *Id.* at 7.  At the emergency room, doctors ordered lab work, chest x-

rays, and an EKG.  At 1:59 a.m., he was given a dose of hydroxyzine (Atarax), an antihistamine

used to control anxiety and tension caused by nerves and emotional conditions.  He was

discharged at 2:25 a.m., with diagnoses of anxiety and chest pain due to psychological stress.  *Id.*

at 138.

Later that same day, July 17, Dr. Shah saw Brown, who said that Effexor and Remeron

were not helping and that he wanted to be back on Wellbutrin.  Dr. Shah agreed to put him back

on Wellbutrin, but he warned Brown that if he attempted to hoard it again, he would take him off

the medicine.  Dr. Shah adds that Brown remained on Wellbutrin the rest of his time at the jail

without any problems.  Dkt. No. 73-2 at ¶¶ 19-20.

Brown was transferred into Virginia Department of Corrections custody and taken to Dillwyn Correctional Center on October 9, 2024.[3]  On October 21, 2024, he submitted an inmate request for his mental health medications that he had not received since arriving.  The response he received, surprisingly, said he was already receiving all his medications, and that he had no mental health medicines, according to his chart.  Dkt. No. 38 at 2.

## B. <u>Treatment of Brown's Leg and Ankle</u>

While at Southwest Regional Jail, Brown frequently complained of problems with his right leg and ankle.  He previously suffered a compound fracture of the leg, and it had been surgically repaired with pins and screws.  Almost as soon as he arrived at the jail, on December 22, 2023, Brown asked to have his leg and ankle "looked at."  Dkt. No. 73-3 at 62.  E. Adams received the request on January 9, 2024, and responded the same day that he had been added to the Nurse sick call list.  Brown submitted another request on December 24, saying he had pins and screws in his leg, and it was swollen and hurting.  Medical received that request on January 10, 2024.  A nurse responded the same day that Brown had been added to the Nurse sick call list, and please do not re-submit the same request, but be patient.  *Id.* at 63.  On December 28, Brown requested an extra mat, because he was sleeping on the floor, and his legs were going numb.  Medical also received that request on January 10.  M. Hixenbaugh responded that Brown was being added to the Doctor's list and again urged him not to submit the same request before they had time to triage the prior request.  *Id.*  at 64.  On January 3, 2024, Brown submitted a request, saying "I need to see the doctor over my back and legs this is my 3rd request thank you."

---

[3] Brown previously filed Motions for Preliminary Injunction on September 19, 2024, ordering the defendants to provide proper medical care. Because Brown is no longer at the SWVRJ, these motions are moot, and I will dismiss them.  *See Williams v. Griffin*, 952 F.2d 820, 823 (4th Cir. 1991) (holding that prisoner's transfer rendered moot his claims for injunctive relief at the prior facility).

Medical received that request on January 10.  M.M1159 responded on January 11 that he had

been seen by Nurse Practitioner Greear on January 11.  *Id.* at 65.

Heather Greear saw Brown on January 11 for his 14-day health assessment as part of his

intake process.  She reviewed his medications that had been brought from home and assessed his

chronic back pain, including his request for an extra mat because he recently had back surgery

and had pins in his legs.  *Id.* at 17.

Brown submitted a medical request on January 23, saying he needed his ankle looked at

because he had screws in it, and it hurt to walk.  A nurse responded the next day, saying he had

refused his appointment on January 21.  *Id.* at 67.  On January 27, he asked to have his leg

looked at because it hurt when he walked on it.  A nurse responded the next day that he had been

added to Nurse sick call.  *Id*. at 70.  On February 2, Brown submitted a request saying that he

was in the floor, his arms were going numb, and it hurt to walk.  He asked, "can something be

done?"  A nurse responded the next day, advising him to notify staff when he can't walk.  *Id.* at

73.  Nurse Practitioner Crystal Large saw Brown on March 18 for his January 27 complaint of

pain when walking.  After discussing that Celebrex and Robaxin were not helping his pain, Large

discontinued those prescriptions and started him on Mobic and Nortriptyline for pain.

On February 14, Brown asked to be put back on Tylenol for his back and leg pain

because he was told that the order had run out.  He received a response from Ms. 1.1165 that he

had been added to Nurse sick call.  *Id.* at 75.  On March 18, Brown submitted a concern that

officers would take his second mat during a shakedown if they did not know he was medically

allowed to have two mats.  Nurse G. Stanton replied the very same day that she would let the

officer know.  Brown's next request regarding his leg was made on April 8, saying "Can I get

someone to look at my ankle and knee [?] It is sweld (sic) up and hurts."  Nurse Carroll

responded the same day, saying that he was scheduled to see the nurse.  *Id.* at 89.  Brown saw

Nurse Ward on April 9.  She documented swelling in the ankle, discussed the matter with Nurse

Practitioner Greear, and ordered ibuprofen 600 mg. twice per day for 7 days.  *Id.* at 15.

On May 7, Brown wrote, "I have a [piece] of metal in my hand and I need a x-ray of my

foot and leg and [to be] put back on my Tylenol" in the mornings.  Nurse R. Maggard responded

the same day that Brown had been scheduled for a Nurse sick call.  *Id.* at 103.  On May 8, Nurse

Addington saw Brown. She did not observe any swelling, but he noted that it was usually worse

later in the day. In addition to Tylenol, Brown asked if his Mobic could be moved to the morning,

because he has more pain during the day than at night, and he asked for a compression sock.

Nurse Addington moved Brown's Mobic to the morning and prescribed Tylenol, two tablets three

times per day, as needed, for five days. She also denied his request for a compression sock, but

placed him on the list to be seen by the doctor.  *Id.* at 11.

Nurse Addington saw Brown again on May 27.  Brown complained of a bruise on his

ankle when he woke up.  She observed abnormal bruising on the inner right ankle.  Brown

denied any injuries but was afraid that pins were coming out.  She placed him on the list to be

seen by the doctor.  *Id.* at 10–11.

Dr. Charles Hurlburt examined Brown on May 28 and observed mild swelling in the

ankle and some chronic venous stasis changes.  He increased Brown's nortriptyline to 50 mg.

and ordered compression support stockings.  *Id.* at 10.

On July 20, Brown asked what he needed to do to get Tylenol started again.  Nurse

Carroll responded the same afternoon, advising him to request a sick call for that purpose.  *Id.* at

118.  Brown then submitted a request to see the nurse for his back and leg pins.  *Id.* at 119.

Nurse Thomas responded the next day that he had been added to the list for Nurse sick call.  *Id.*

Nurse Ward saw Brown on July 21 for his back and leg pins.  Brown asked for a refill of his

Tylenol. Nurse Practitioner Greear approved the request for Tylenol, 650 mg. twice per day for

30 days.  *Id.* at 6–7.

On July 28, Brown submitted a sick call request, asking to have his leg looked at and x-

rayed because it was bruising more and hurting worse than normal.  Nurse G. Johnson replied

that he had been placed on the list to be seen by a nurse.  *Id.* at 122.  On August 3, Brown wrote,

"I had a sick call Monday over my leg and I was told I was going to see the Dr. I need it look[ed]

at my ankle is black and [swollen]."  *Id.* at 123.  Nurse B. Carroll replied early the next day that

he was scheduled to see the nurse.  *Id.*  Nurse Carroll then saw Brown later that day.  She

observed some swelling, a small red area, and no drainage.  Brown asked to be seen by the

doctor, and she told him that he was on the list to be seen.  *Id.*  at 6.

Brown wrote, "I need to see the doctor over my foot" on August 9.  Nurse G. Johnson

responded the same day that he had been placed on the list to be seen by a nurse.  *Id.* at 124.

Nurse Addington saw Brown on August 10.  She observed an area on his foot the size of a dime

that was missing the top layer of skin which Brown believed was a screw coming out and

pushing against the skin.  Nurse Addington could not see a screw, but she did see redness

surrounding the area, and no drainage.  Nurse Practitioner Large ordered an x-ray for August 12

and a prescription for Bactrim for 10 days.  *Id.* at 6.

Dr. Charles Hurlburt examined Brown on August 14.  Brown complained that he had hurt

his right leg coming off the top bunk a couple of weeks earlier, and the red spot on his foot

appeared a couple of days later.  Dr. Hurlburt did not see any swelling, but he saw a small skin

ulceration by a scar.  There was no drainage.  He diagnosed a resolving skin abscess and ordered

a right tib-fib x-ray.  *Id.* at 5.

On August 17, Brown wrote that he had gotten x-rays of his leg and ankle and wanted to know the results because it was still swollen and hurt to walk on. Nurse Carroll responded that his request had been sent to be reviewed. *Id.* at 125. On August 19, Brown asked again what the x-ray said and when he would get help, because his leg hurt. Nurse G. Johnson responded that she could see that an order had been placed for the x-ray and completed, but the results had not been uploaded yet. *Id.* at 126. Brown saw Dr. Hulbert the next day, saying he wanted to know the x-ray results because his leg and ankle still hurt. Dr. Hurlburt advised him not to jump off the top bunk and scheduled Brown for a re-check on September 3. *Id.* at 5.

On August 21, Brown wrote that he had not received his Tylenol the previous evening or that morning, so he wondered if it needed to be re-ordered. Nurse Carroll replied that he was scheduled to see the nurse. *Id.* at 127. Nurse Carroll saw Brown on August 24. He said that he saw the doctor and got x-rays but has not been told the results. Nurse Carroll observed slight discoloration of the skin on his right leg. Nurse Practitioner Large authorized an order for Tylenol, 650 mg. twice a day, for 30 days. Nurse Carroll confirmed that Brown was on the list to see the doctor. *Id.* at 4.

Brown complained on September 5 that he still had not seen the doctor, did not know the x-ray results, and his leg was not getting better. He noted that he had been trying to get some answers since July 1. He wanted to see the doctor and not pay for another sick call that couldn't tell him anything. Nurse Carroll responded the same day that he was on the list to be seen and that he would stay on the list until he was seen or refused to be seen. *Id.* at 129. Brown submitted another request on September 16, saying that he was still waiting to see the doctor and his foot and leg were getting worse. The medicine was not helping. Nurse Stanton confirmed that he was still on the list for a recheck by the doctor. *Id.* at 131. On September 23, Brown

12

submitted a request for his Tylenol to be re-ordered and asked if he was moving up on the list to see the doctor. Nurse Carroll replied that he was scheduled to see the nurse and the doctor. *Id*. at 132.

Dr. Hurlburt saw Brown on September 24. In talking with Brown, he learned that Brown had a hairline fracture a year earlier and was released after being in a boot. He also learned that Brown had complications after the surgery correcting his compound fracture in 2018. Dr. Hurlburt requested the most recent orthopedic records from the surgeon, refilled an order for Tylenol, and ordered replacement support stockings. *Id.* at 4. The very next day, Brown submitted a request, saying that he had seen the doctor and was told the x-ray showed something going on with the hardware in his leg. He asked to be seen by an orthopedic doctor, because the longer the problem remained without being fixed, the more damage will be done. Nurse Addington responded that she was sure they were addressing the issue, but it wouldn't happen overnight. *Id.* at 133. Brown responded on September 27, acknowledging that he knows it takes time, but he hurt his leg July 28 and has been trying to get something done ever since. Nurse Carroll responded that the doctor was waiting on the records from his orthopedist. *Id.* at 135.

Brown's transfer to Dillwyn Correctional Center ended the Southwest Regional Jail medical unit's involvement in his care.

## C. **Other Jail Conditions**

Brown complains of other conditions at the jail which he considers sufficiently deplorable to be a violation of his right to be free from cruel and unusual punishment. First, he alleges that the medical observation cell he was placed in July 12 through July 18 had black mold all over it. Second, when they moved him back to general population on July 18, he was assigned to a top bunk, while he is supposed to be limited to a lower bunk because of his injuries.

He couldn't sleep on the floor because ants were all over the floor, which was his final complaint about the jail conditions.

## II. STANDARD OF REVIEW

In ruling on a motion for summary judgment under Rule 56, the court must determine whether there is a genuine dispute over a material fact. *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986). A factual dispute is genuine if there is some real evidence to support a factual claim contrary to that asserted by the party moving for summary judgment. A fact is material if it could affect the outcome of the trial. If a jury could return a verdict for either party, depending on which facts it believes, then the moving party is not entitled to summary judgment. *Id.* The court must draw all reasonable inferences from the evidence in favor of the non-moving party. The court may not consider the weight of the evidence or credibility of the parties, because that is the function of the factfinder. *Alexander v. Connor*, 105 F.4th 174, 178–79 (4th Cir. 2024).

## III. DISCUSSION

### A. Jennifer Addington, LPN

Brown's Amended Complaint alleges that Nurse Addington took away his medications for 30 days. Through numerous documents that he filed to support his Amended Complaint, including his grievances (Dkt. Nos. 14, 20-1), some of his medical records, and numerous affidavits (Dkt. No. 28), Brown contends that Nurse Addington falsely accused him of hoarding medicine and punished him by taking away his mental health medication and pain medication for 30 days. Because this caused him to experience increased pain and anxiety, he seeks to hold her liable for improper medical care.

The Eighth Amendment prohibits unnecessary and wanton infliction of pain, which serves no penological purpose. This does not mean that every claim of medical mistreatment is

an Eighth Amendment violation. "Medical malpractice does not become a constitutional violation merely because the victim is an inmate." *Estelle v. Gamble*, 429 U.S. 97, 106 (1976). For medical treatment to become a constitutional issue, a prisoner must allege acts or omissions that show deliberate indifference to serious medical needs. *Id.*

There are two components to deliberate indifference, one objective and the other subjective. Objectively, the alleged acts or omissions of the medical personnel must cause, or create a serious risk of causing, significant physical or emotional injury. Subjectively, the facts must show that the defendant actually knew of the objectively serious risk of harm to the prisoner and disregarded that risk in their actions. *De'Lonta v. Johnson*, 708 F.3d 520, 525 (4th Cir. 2013). Whether the defendant had the requisite knowledge of the risk is a question of fact, "subject to demonstration in the usual ways, including inference from circumstantial evidence . . . and a factfinder may conclude that a [defendant] knew of a substantial risk from the very fact that the risk was obvious." *Farmer v. Brennan*, 511 U.S. 825, 842 (1994).

In their respective affidavits, both Nurse Addington (Dkt. No. 73-1, ¶ 7) and Dr. Shah (Dkt. No. 73-2, ¶ 12) explained that medication hoarding is common in correctional settings, creating "serious safety risks to the patient and the other inmates." *Id.* Nurse Addington further indicated that the nursing staff were to report "*any* incidents of attempted medication holding to a provider," so that the provider could determine the appropriate course of action. Dkt. No. 73-1, ¶ 8 (emphasis added). Based on seeing Brown hold his hand in a fist, drink water, allow his mouth to be inspected for unswallowed pills, then have medicine in his hand when directed to open his fist, Nurse Addington reasonably suspected Brown was hoarding medication. She reported her observations and suspicions to the provider on duty, a Nurse Practitioner, who placed a 30-day

hold on Brown's Wellbutrin, Mobic, and Nortriptyline.  Nurse Addington notified mental health

staff of the incident and of the Nurse Practitioner's order.  *Id.* at ¶¶ 6, 10.

Nurse Addington may have been wrong in concluding that Brown was trying to hoard his

medication.  For purposes of this motion, the court accepts as true that Brown was unable to

swallow all seven pills with a single drink of water.  That is not proof that Addington acted with

malice or deliberate indifference.  It is not even enough to create an inference that she lied.

Brown does not deny that he still had some medication in his hand; he states only that he could

not swallow them all in one gulp, and he had no intention of hoarding them.  Nurse Addington's

report to the Nurse Practitioner was reasonable, indeed professionally responsible if not required,

based on her observations and interpretation of the event.  Failure to report it could create a

safety risk for the plaintiff or for other inmates, as previously noted.  She did not act with

knowledge of a serious risk to plaintiff if she reported what she saw; to the contrary, she acted

with knowledge of the serious risks of not reporting, if her observations were correct.  Being

mistaken about Brown's intentions is not deliberate indifference.

As an LPN, Nurse Addington had no authority either to prescribe medication for a

patient, or to discontinue the medication.  She can dispense medication only at the direction of

medical doctors or Nurse Practitioners, who have prescribing authority.  Once the medication

had been discontinued, Nurse Addington had no authority to dispense it to Brown until a proper

provider prescribed it again.  I will grant the motion for summary judgment in favor of Nurse

Addington on the medication claims.

Brown has not alleged anything that Nurse Addington did to violate his rights regarding

the treatment of his leg.  Brown continually complained that "nothing was being done," but the

medical records do not support his complaint.  He was seen by a nurse or by a nurse practitioner

on a near-weekly basis for his complaints of leg pain, and x-rays were taken in August 2024. He also saw Dr. Hulbert several times. His preference to be seen by a doctor instead of a nurse does not render the medical care he received inadequate, and his expectation of different treatment than what he received is nothing more than a disagreement with the medical professionals over the treatment to be rendered, which does not constitute deliberate indifference. *Jackson v. Lightsey*, 775 F.3d 170, 178 (4th Cir. 2014). I will grant the motion for summary judgment to Nurse Addington on this claim.

Finally, Brown has offered nothing to contradict Nurse Addington's affidavit stating that she is not responsible for cleaning cells or sanitation in the jail, nor has he alleged in any way that her conduct caused the black mold in one cell to remain or that she was responsible for arranging extermination services for ants in the jail. Nurse Addington did not have the authority to assign Brown to a bottom bunk or a handicap-accessible cell. I will grant the motion for summary judgment to Nurse Addington on these claims as well.

**B. Dr. Amit Shah**

Brown complains that Dr. Shah changed "the dose" of his Wellbutrin 300XL, that he went without Wellbutrin from April 6 until May 6, and that his Wellbutrin ran out on July 3, and he did not get it back until July 17. He alleges that Dr. Shah was deliberately indifferent to his need for the mental health medication. The same standard of deliberate indifference applies: Brown must show that he had an objectively serious medical need, and that subjectively, Dr. Shah knew about Brown's need, knew the risk of serious harm caused by his course of action, and disregarded that risk, proceeding with the course of action anyway. *De'Lonta*, 708 F.3d at 525.

17

Brown was diagnosed with PTSD, persistent depressive disorder, generalized anxiety disorder, and a history of alcohol dependence. When he reported to jail, he brought the prescription Wellbutrin which had been prescribed for him by his doctor for several years. A condition is serious when it has been diagnosed by a physician as needing treatment. *Scinto v. Stansberry*, 841 F.3d 219, 225 (4th Cir. 2016). PTSD, depression, and anxiety are objectively serious medical needs. Dr. Shah, the psychiatrist at the three SWVRJ facilities, was aware of Brown's serious medical needs. Dr. Shah saw Brown on December 19, 2023, on Brown's entrance into the facility and talked with him about his medication. He decided to maintain Brown's current treatment regimen but switched the medication from one extended-release 300 mg tablet per day to 150 mg of regular (not extended release) medication twice per day. He saw Brown again in March 2024, noting that Brown was doing well on the medication. Dr. Shah renewed the prescription on March 27, 2024.

Changing Brown's medication from one extended-release 300 mg tablet per day to 150 mg twice per day was a reasonable decision for the reasons explained by Dr. Shah. The overall medication dosage was unchanged, and there was no harm caused to Brown by this change.

As previously discussed in detail, when Nurse Addington reported what she believed that Brown attempted to hoard medication on April 6, 2024, the Nurse Practitioner placed a hold on Wellbutrin, nortriptyline, and Mobic for 30 days and essentially cancelled his naltrexone prescription. Nurse Addington notified the mental health staff of the incident and of the Nurse Practitioner's subsequent order about the medication.

Brown filed a medical grievance about his medication being taken away that same day, April 6. Dkt. No. 73-3 at 46. He filed another grievance on April 8, stating that withholding his medication was dangerous to his mental health. Nurse Carter responded that same day, saying

18

"this can be discussed with your provider[.] [Y]ou have been added to the provider list to discuss this issue." *Id.* at 47. On April 13, 2024, Brown submitted a sick call request, advising that he was found not guilty on the charge of stockpiling meds and asking when he could get put back on his medication, stating simply, "I need them." *Id.* at 93. Nurse Carroll responded within 20 minutes, saying that his request had been sent to the doctor and to mental health to review. *Id.* On April 14, he filed another grievance, advising that he had been found not guilty of the hoarding charge and hoped he could now get his medicine back. He added that he had been on Wellbutrin for years, and after one week without it, he was not feeling right. Nurse Carter responded that he would be placed on the provider's list to discuss this issue. *Id.* at 49. Brown spoke with Jill Pearce, QMHP, on April 15, 2024, about wanting to be back on his medication, as the hoarding charge had been dismissed. She advised that the doctor can still hold the medications if he believed that Brown had been hoarding. In the chart, she wrote that Brown was cooperative but appeared anxious with irritable mood. She had a telephone conference with Dr. Shah, who told her to put Brown on the schedule for the upcoming Wednesday [which would have been April 17] to discuss Brown's concerns, and she did so. *Id.* at 28.

There is no indication that Dr. Shah saw Brown on April 17, but on April 18, Brown met with the resident-in-counseling from the mental health department, and he told her he was having night terrors, cried at the drop of a hat, had no appetite, couldn't sleep, and kept thinking about being covered in blood when he witnessed his dad being killed. She noted that he appeared anxious and agitated, and she told him she would see if she could get him in for an earlier review of his medications. Dr. Shah acknowledged being advised of Brown's condition and complaints by the resident. On April 24, Dr. Shah wrote a chart note saying "pt has been caught hoarding

wellbutrin (sic) 5 times as per Jill, so will keep wellbutrin (sic) on hold and Jill will schedule

patient." *Id.* at 1. Dr. Shah did not see or speak with Brown.

On April 25, Brown sent an inquiry to mental health, stating "I thought I was going to see

someone yesterday." *Id.* at 96. He received a response from 6.6955 on April 26, saying "The

psychiatrist reviewed your chart and medications will remain on hold. I have you scheduled to

see him when your hold is up." *Id.* On April 26, Brown sent another request, saying "I can't

sleep and getting very depressed I need my meds back and something for sleep having night

[terrors] and cold sweats (sic) cry a lot don't understand why I'm being punished for something I

didn't do this is crazy." The response from 6.6955 said, "Please see previous response. Thank

you." *Id.* at 98.

On May 6, Brown sent a request to mental health, noting that he had expected to get his

medicine back that morning because the 30 days were up, and he had not done anything wrong.

The response from mental health, 6.6955, said "You are scheduled to be seen today by the

psychiatrist." *Id.* at 101. Dr. Shah acknowledged that Brown complained of anxiety symptoms

on May 6 when he came for reassessment. He stated in his affidavit that he decided to

discontinue the Wellbutrin rather than reinstate it because of the "multiple hoarding attempts,"

but he prescribed other antidepressants, Effexor and Remeron, to relieve Brown's symptoms.

The chart notes he entered on May 6 indicate a plan to "d/c wellbutrin (sic), restart effexor (sic)

ER 75 mg po am restart remeron (sic) 15 mg po pm." *Id.* at 26. In the medication orders

section, he ordered the Effexor XR 75 mg daily each morning and mirtazapine (generic for

Remeron) 15 mg to be crushed and given under water each evening. On May 7, 2024, Brown

once again started receiving his previously prescribed Wellbutrin that was no longer on hold. He

also started Effexor and Remeron. Dkt. No. 73-2 at ¶ 16.

In the light most favorable to Brown, he went an entire month without mental health medication that he needed, and began having symptoms of anxiety, mood instability, and PTSD. His medication was discontinued abruptly; he was not titrated down, as recommended when one has been on a high dose for a long period of time. Keri Wiginton, *Wellbutrin (Bupropion) Withdrawal*, Web MD, 5 (June 12, 2025), https://www.webmd.com/depression/wellbutrin-withdrawal. At least by his April 15 telephone conference with Jill Pearce, if not sooner, Dr. Shaw knew that Brown was having difficulty without his medication, yet he did not even meet with Brown, pushing off appointments until the 30-day hold was up. He did not prescribe alternative medications for Brown's symptoms during those 30 days. Dr. Shah's affidavit says that failing to take medication as prescribed, including *not taking* any of the medicine, poses a serious safety risk to the patient and can even lead to death. Dkt. No. 73-2 at ¶ 12. This evidence, in the light most favorable to Brown, suggests that Dr. Shah subjectively knew the risks of withdrawal symptoms and the risks of relapse to Brown's underlying mental health condition.

Whatever action might be needed to protect an inmate and other prisoners from gaining unauthorized access to potentially harmful or addictive medications, intentionally denying or delaying an inmate's access to necessary medication for his serious medical condition is the wanton infliction of pain, the very definition of cruel and unusual punishment. If a single *documented* incident of potentially hoarding medicine is *medical* justification for withholding a particular prescription, it does not justify leaving an inmate untreated for the condition at all. Dr. Shah has offered no evidence to explain why it was *medically* necessary to leave Brown's mental health condition medically untreated for 30 days. *See Lowe v. Johnson*, No. 21-7443, 2023 WL 7179461, at *3–*4 (4th Cir. 2023) (unpublished per curiam) (holding that discontinuing inmate's

Dilantin was not deliberate indifference, but failing to prescribe an alternate medication for 14 days without a medical reason stated a claim for deliberate indifference). I will deny Dr. Shah's summary judgment motion regarding alleged deliberate indifference between April 6 and May 6, 2024.

Dr. Shah said he did not renew Brown's Wellbutrin prescription on July 7, because Brown was on Effexor and Remeron, but Brown asked to be placed back on Wellbutrin. Dkt. No. 73-2 at ¶ 17. The medication administration record shows that Brown was not given Wellbutrin on July 1 or July 2, and on July 3 through July 6, he was given the medication only in the evening. Dkt. No. 73-3 at 38. On July 3, he submitted a sick call request, saying "I need to talk to you about my medication." *Id.* at 108. On July 8, Brown filed a grievance about not getting his Wellbutrin. Nurse Carter responded that the order had expired and was under review by mental health to be renewed. *Id.* at 50. Brown filed another grievance on July 9, clearly showing his frustration at not getting his mental health medication. Nurse Carter responded that his medication had been ordered through the pharmacy and was expected to arrive the next day after 2:00 p.m. On July 10, he asked what medicines had been ordered; he needed his Wellbutrin. Nurse Mullins replied, that per the psychiatrist, Wellbutrin was discontinued and Effexor and Remeron were reordered from the pharmacy. *Id.* at 51.

On July 12, Jill Pearce advised Dr. Shah that Brown reported worsening anxiety since stopping the Wellbutrin, and he asked that it be reinstated. Dr. Shah told Ms. Pearce that he would reassess Brown the next week. Dkt. No. 73-2 at ¶ 18. Brown, meanwhile, presented to the medical unit for a blood pressure check, complaining of chest and neck symptoms. His blood pressure was 180/80 and his oxygen saturation was slightly low at 93%. Nurse Addington noted that Brown was shuffling from side to side and moving his arms. She also noticed his hand

shaking, which he attributed to growing anxiety from being off his Wellbutrin.  Brown was

moved to medical for monitoring.  Nurse Addington also called mental health to advise of

Brown's situation.  She was told that he was on the list for a follow-up visit.  Dkt. No. 73-3 at 7-

8.  Brown's condition worsened to the point that he was transferred to the hospital in the early

morning of July 17.  He was ultimately discharged with a diagnosis of anxiety and chest pain

caused by psychological stress.  Later that day, Brown met with Dr. Shah and asked to be put

back on Wellbutrin.  Dr. Shah discontinued the Effexor and Remeron and prescribed Wellbutrin.

There were no further incidents regarding his mental health medication before he transferred to

Dillwyn Correctional Center in October.

Several unresolved factual issues remain for the 11 days that Brown received no

Wellbutrin in July, including when Dr. Shah became aware that Brown received Wellbutrin

between May 7 and early July and whether abrupt discontinuation of the Wellbutrin created a

risk of harm to Brown that Shah recognized, even though Brown was still taking Effexor and

Remeron.  From the numerous grievances filed with mental health as well as with medical during

the early part of July, in the light most favorable to Brown, a reasonable jury could reasonably

infer that Dr. Shah knew that Brown had been abruptly discontinued from his Wellbutrin, again,

by July 9, and that by July 12, he knew that Brown was suffering serious physiological

symptoms of stress and anxiety.  I will deny Dr. Shah's summary judgment motion on the alleged

deliberate indifference in July 2024.

As the facility psychiatrist, Dr. Shah had no responsibility for treatment of Brown's leg.  I

will grant his Motion for Summary Judgment on that claim.  Further, Dr. Shah had no

responsibility for cleaning black mold out of jail cells, arranging for extermination of ants, or

assigning inmates to bottom bunks or handicap-accessible cells.  I will grant his Motion for Summary Judgment on all these claims.

## C. **Brown's Motion for Summary Judgment**

For purposes of Brown's Motion for Summary Judgment, Dr. Shah, the only remaining defendant, is the non-moving party, and I must view the facts in the light most favorable to him. In denying Dr. Shah's summary judgment motion, I discussed the facts and inferences from those facts in the light most favorable to Brown.  A jury may find those facts in Brown's favor, but they may not.  Dr. Shah will likely testify that he did not believe there was a significant risk of harm to Brown from discontinuing the medication for 30 days and that he did not know that Brown was taking Wellbutrin in May and June.  Those are disputed issues of material fact, and the court cannot choose which facts to believe.  That task is for the jury.  I can only identify whether there are genuine disputes of material fact, and if there are, summary judgment must be denied.  There are two sides to the case between Brown and Dr. Shah, and it is up to the jury to resolve the factual disputes. I will deny Brown's Motion for Summary Judgment.

CONCLUSION

I will grant the defendants' Motion for Summary Judgment in favor of Jennifer Addington, and I will grant in part and deny in part the Motion for Summary Judgment by Dr. Shah.  Finally, I will deny Brown's Motion for Summary Judgment.

An appropriate order will be entered this day.

Enter:  December 23, 2025

/s/ Robert S. Ballou

Robert S. Ballou
United States District Judge